DE RIEMER and others *against* CANTILLON and others.

Where, on a sale of land, mills, &c. in the possession of the defendants, under an execution against them, the deed executed by the sheriff to the purchaser, by *mistake*, did not include the whole premises advertised, and intended to be sold, the sheriff having taken the description from an original title deed, for 72 acres, without adverting to the subsequent conveyances of some small parcels contiguous, and of the water lot adjoining the original premises ; the defendants, and all parties, at the time, supposing the sheriff's deed included the whole, and the purchaser having bid, and paid a price accordingly: *Decreed,* that the defendants be perpetually enjoined from prosecuting the ejectment suits brought by them to recover the parcels of land not included in the sheriff's deed to the purchaser, and that they execute to the purchaser a release of all their right and title to the same.

Where a judgment at law, by confession on a warrant of attorney, appears regular and formal, according to the record, this Court will not interfere with, or impeach it, on the ground of any alleged irregularity, or informality in entering it up ; but will consider the rights acquired under such judgment, as valid in law ; especially, where several years have elapsed since the judgment, and the defendants have acquiesced in it, and in the execution and sale under it.

THE bill stated, among other things, that *Richard De Cantillon,* in his life time, owned seventy-two acres of land on the *Hudson* river, which, in his title deed, was described as beginning at a hemlock tree, on the bank of *Crom Elbow Creek*, and described by metes and bounds, and running to the *Hudson,* and along the river to the creek, and then as

the creek runs, including the creek, to the place of begin-ning. *De Cantillon* built mills on the creek, and on the land; and he, jointly with *J. T. Stoutenbergh*, purchased several small pieces of land adjoining, on the north side of the creek, for the purpose of making dams, from *S. Bard,* the deeds for which were dated in *June* and *September*, 1790; and on the 6th of *December*, 1793, *S.* released all his right to *De Cantillon*, who, afterward, obtained a patent for five acres of land covered with water, in the *Hudson*, *adjoining* ~~against~~ his seventy-two acres, for the purpose of making a wharf and landing place. *De Cantillon* died in *February*, 1806, seized of all these parcels of land, &c. and his right and title descended to his four children, two sons, and two daughters, who were defendants. In 1809, several judgments were obtained against the children, the second of which was in favour of *James Roosevelt*, for 7,000 dollars, against three of the children, who, also, executed a mortgage on their undivided three fourths to *R.* Another judgment was in favour of *Clapp Raymond*, on the 28th of *October*, 1809, against the same children, on which a *fi. fa.* was issued in *October*, 1809, by virtue of which the sheriff seized all the said lands owned by *R. De. Cantillon*, at his decease, and sold the same, at auction, to *John Parkinson*, for 350 dollars, subject to all the incumbrances, most, or all of which, then remained wholly unpaid, particularly the judgment in favour of *R.* On the 26th of *February*, 1811, the sheriff executed a deed to *P.* for the 72 acres of land, and, as the bill alleged, by *mistake*, reference was had to the original deed for the seventy-two acres, without including the contiguous pieces of land purchased of *Bard*, or the land under the water of the *Hudson*, all of which were, at the time of the sale by the sheriff, and at the time of his executing the deed to *P.*, in the possession of the four defendants named in the execution, without being distinguished, or separated by enclosure, from the tract of seventy-two acres. *P.*, in 1810, recovered a judgment against the

four children of *C.*, for a large sum of money, and in *June*, 1811, took an assignment from *R.*, of the mortgage and judgment. *Catharine*, one of the daughters, and her husband, *Collins*, in *December*, 1810, executed a conveyance to *P.* for an undivided fourth of the seventy-two acres; and on the 1st of *May*, 1811, the sons, and the daughter, and *Collins*, gave up the possession of all the lands above mentioned, and the wharf, landing, &c. except two houses, which they retained, with consent of *P.* It was, afterwards, ascertained, that all the incumbrances amounted to fifteen thousand dollars, and *P.* told the four defendants, that if he could sell all the property for that sum, he would not enforce the judgments, &c. against this, and other property of the defendants. *Peter De Riemer*, since deceased, at the request of the four defendants, purchased of *P.* these parcels of land, so in possession of the four defendants and *P.*, which he examined, in company with the defendants, and took a deed from *P.*, dated the 1st of *May*, 1812, describing the seventy-two acres, as in the deed of the sheriff, without including the pieces bought of *Bard*, and the land under the water of the *Hudson*. During all this time, *Parkinson*, the sheriff, and *De Riemer*, understood and believed, that the sheriff's deed included all the lands so possessed by those defendants, and both *P.* and *De Riemer* paid a price accordingly; and the bill charged, that the four defendants, who were present, and assented to the purchase by *D.*, fraudulently concealed from him and *P.*, until *May*, 1813, that the boundaries in the sheriff's deed to *P.*, and in the deed of *P.* to *D.*, did not include the lands purchased of *Bard*, or the land covered by water. *De Riemer*, after the purchase of *P.*, suffered *R.*, a plaintiff, to occupy the store and wharf, &c. and others to occupy the grist mill, &c. In *May*, 1814, the defendants brought an action of ejectment against *L.*, for the wharf, &c. and another ejectment against the occupiers of the mill, &c., on the ground, that no title passed by the deeds abovementioned, for the

1819.

DE RIEMER
v.
DE CANTIL-
LON.

the land purchased of *Bard*, or the land covered with water; and also, on the ground, that the judgment in favour of *Clapp Raymond* was void, having been entered on a warrant of attorney, in vacation, in the Court of Common Pleas of *D.*, and no rule for judgment entered on the records of the Court. In the actions of ejectment, verdicts were taken for the plaintiff, subject to the opinion of the Supreme Court, on a case made, but which had not been argued. The suit against *L.* had been stayed by an injunction. The mills and water lot were the principal objects of *De Riemer* in making the purchase. Prayer for an injunction from proceeding in the ejectment suits, and that the defendants may be decreed to execute a release to the plaintiffs of the lands not included in the deed to *P.*

*Peter De Riemer* died *October* 2d, 1814, possessed of the seventy-two acres of land, &c. and by his will, devised the use of his estate, real and personal, to his wife, for life, and directed all his estate, real and personal, to be sold by his executors, and the proceeds to be divided among his children. The bill was filed by the widow and children of *Peter De Riemer*, deceased, plaintiffs, against the children of *De Cantillon*, and *J. S. Stoutenburgh*.

The material parts of the answer, and of the evidence, are sufficiently stated in the opinion delivered by the Court.

*P. Ruggles*, for the plaintiffs.

*J. Tallmadge*, for the defendants.

THE CHANCELLLOR. The proof in this case is full and complete, that the deed from the sheriff to *Parkinson* did not convey all the land that was sold and bid off at the sheriff's sale. Considering the situation and possession of the parcels of land not included in the sheriff's deed, it is difficult to believe, that they would have been *intentionally* omitted in the sale. They are parcels of land appurtenant

+ after his death

to the seventy-two acres, and were purchased by the ances-
tor of the defendants, as proper and necessary for the enjoy-
ment of the landing, and to give due value to the privileges
attached to the farm.   No reasonable man could ever have
thought of separating the land fronting *Hudson's* river from
the water lot, because the latter would be useless without the
former, and it is essential to the value of the former as a
landing place.   Nor would any reasonable man think of
separating the mills on the creek from the small parcels of
land on the north side of it, which are required for the con-
struction, support, and use of dams on the creek, and are
of little value for any other purpose.   We accordingly
find, that the defendants, prior to the sheriff's sale, had en-
joyed the water lot, and the small pieces of land north of
*Crom Elbow* creek, as part and parcel of the farm, without
any visible distinction or separation, by fence or otherwise.
And when the sheriff advertised the farm for sale by execu-
tion, he stated, that he should sell the seventy-two acres,
" with the mills, landing, &c. in possession of the defend-.
ants."   The witnesses present at the sale concur in the fact,
that not only the seventy-two acres, but the wharf, store,
mills, and privileges belonging thereto, were put up by
the sheriff, and actually struck off to *Parkinson*.

The cause of the mistake in the deed is easily seen, from
the fact, that the deed was drawn, as to description and
boundaries, from the original deed to *Richard De Cantillon*,
deceased, of the seventy-two acres, without having re-
course to the subsequent conveyances of the water lot, and
the parcels north of the creek.   But all the parties under-
stood, that all the rights and privileges, and land appur-
tenant to the seventy-two acres, had actually passed, and
the defendants, at once, surrendered up possession of the
whole to *Parkinson*, the purchaser.   No separation was
thought of, at the time, by any of the parties in interest.

It is clear, that *P.* intended to buy; and thought he had
purchased the land now in dispute.   He bought subject to

all existing incumbrances, which then amounted to 15,000 dollars, so that he gave near 16,000 dollars for the land, including another farm of 200 acres, which he bought at the same time. Admitting the other farm to be worth 8,000 dollars, which the defendants allege to have been the value at the time, and admitting the seventy-two acres, exclusive of the water lot, and the *Bard* lots, to have been worth 50 dollars an acre, (and all the witnesses agree that they were not worth more,) then *P.* gave upwards of 4,000 dollars more than the real worth of the land at the time, if he did not buy the land now in question. This fact is decisive proof of his intention. Besides, *P.* took possession of the whole, with the assent and approbation of the defendants, and he used and occupied it as owner, with the like knowledge and assent. This appears from his advertisement in the public prints, offering the landing for sale, containing seventy-two acres, with mills, a dock, store houses, &c. It appears, also, from the fact, that he repaired the wharf, and with the knowledge and assistance of one of the defendants.

Neither *P.*, nor the defendants, were aware of the mistake in the sheriff's deed, until after the purchase by *De Riemer*. It is in proof, that *De Riemer* intended to buy the whole land, including what is now the subject of controversy, that he previously examined the store and wharf, and mills, and declared that they were the principal inducement to his purchase, and constituted its chief value. One of the defendants accompanied him in his examination, and he gave the consideration of 15,000 dollars. After he had taken his deed, which was copied, as to boundaries and description, from the sheriff's deed, (for the same mistake in description was continued,) he took possession of the whole entire premises, as *P.* and as the defendants before him had possessed them. He leased the store and mill, and had the land surveyed, and one of the defendants attended the survey, and pointed out the slip of

land lying north of the creek, which had been leased of
Samuel Bard, as the correct northern boundary.

In short, it is evident from the testimony of the witnesses, and from the answer of the defendants, that the defendants, equally with the sheriff and P., in the first instance, and with P. and De Riemer, afterwards, were under the mistaken impression and belief, that all the lands adjoining to the seventy-two acres, as part and parcel thereof, had been duly conveyed and possessed, according to the original sale by the sheriff; and the mistake in the deeds was not discovered by either of them, until after De Riemer's purchase in 1802.

Can it be possible, that such an obvious and injurious mistake as this ought not to be corrected? The correction is required by the most obvious justice. The defendants, who acquiesced in the purchase as it was originally intended, and gave up possession accordingly, and who suffered P. to occupy and improve, and De Riemer to buy and occupy, under the belief that they were the lawful owners of the entire premises, ought, in justice and conscience, to be estopped from availing themselves of that mistake.

The sale and purchase, as I have already observed, was of the entire possession of the defendants, and the mistake in the sheriff's deed was in the description of the boundaries. The defendants were not, strictly, parties to that sale and conveyance, but they were the defendants in the execution under which the sale was made, and in possession of the land; they were present at the sale and delivery, and assisted in carrying the contract into effect according to its true intent and meaning; and if it be just, that the mistake in the deed be corrected, the defendants are particularly bound, in equity and good conscience, to abstain from availing themselves of that mistake, to the prejudice of the plaintiffs. They ought to release, and abandon their claim. More especially ought they to do this, in respect to the plaintiffs,

since they saw *Peter De Riemer* give the consideration of 15,000 dollars, for land not worth 4,000 dollars, if the water lot, and the strip of land north of the creek, be excluded, and since they made no claim, at that time, to that part of the premises, and even encouraged him in the purchase.

Under all the circumstances, the prayer of the bill that the defendants be enjoined from the prosecution of their suits at law, and be decreed to release their claim at law to the plaintiffs, is most reasonable, and founded on clear and established principles of equity.

But, the defendants allege, that the judgment in favour of *Clapp Raymond*, under which the sheriff sold to *P.*, was entered up, in the *Dutchess* Court of Common Pleas, on a confession of judgment, taken out of Court, and which, by the statute, as it then stood, was declared to be void. This is the averment in the answer; but the defendants have not furnished any proof of the fact, and assuming it to be true, the question is, whether that objection can be raised here, and in this case? It is to be inferred, from the answer, that the record of the judgment appears to be regular, and to have been rendered as of *October* term of the *Dutchess* Court of Common Pleas. Whether a rule for judgment was moved and entered in term time, is a matter of fact, and the answer denying the existence of any such rule, is not accompanied with proof. The judgment was confessed, and entered in *October*, 1807, and it does not appear to have been set aside as irregular, or reversed as erroneous. It remains in full force to this day, according to the record. It cannot now be set aside for irregularity, even in the Court of Common Pleas, and this Court has nothing to do with that question. (*Shottenkirk* v. *Wheeler*, 3 *Johns. Ch. Rep.* 275.). Though the statute, in force in 1809, declared, that judgments in the Courts of Common Pleas, entered by confession in vacation, should be void, it is not to be supposed, that the legislature intended, that acts done under such judgments were in no case, and at no time, and under no

possible circumstances, to be regarded as valid. The rights claimed under such judgments are susceptible of confirmation by acquiescence, and time, and the waiver of the irregularity. In the present case, the judgment and the execution and sale under it, have been acquiesced in by the defendants, and recognized by them as valid, until they are barred from application to the Court of Common Pleas, to set aside the judgment as irregular, and until a *bona fide* purchaser for a valuable consideration, and without notice, has been led to purchase under a title derived from that judgment, and with the knowledge, approbation, and encouragement of the defendants, or some of them.

This Court cannot, under such circumstances, question a judgment which stands regular and formal upon the records of the Court. It is bound to regard the rights acquired under it, as legally acquired; the invalidity of that judgment is a point falling within the cognizance of a Court of law, and not of this Court.

I shall, accordingly, decree, that the defendants be perpetually enjoined from further prosecuting the ejectment suits in the pleadings mentioned; and that, within forty days after due notice of this decree, they execute and deliver to the plaintiffs a release of all their right and title to the tracts of land in controversy; and that, if the parties cannot agree as to the form and execution of the release, the same be approved of by one of the masters of this Court, and be drawn and prepared at the expense of the defendants, and that neither party have costs of this suit as against the other.

I have adopted this course as to costs, because the same course was adopted by Lord *Hardwicke*, in *Stiles* v. *Cowper*, 3 *Atk.* 692.) where the heir, as remainder-man had lain by, and suffered an assignee of a lease to rebuild, and had received the rent, and then brought an ejectment for defect of legal title in the assignee. The Lord Chancellor, by injunction, quieted the assignee in his possession, but de-

clared that no costs were to be paid on either side. The same rule was followed in the similar case of *Jackson* v. *Cator*, (5 *Vesey*, 685.) where a landlord, by his conduct, amounting to acquiescence and consent, was restrained from exercising his legal right.

Decree accordingly.